IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY SMITH,                          )
                                        )
                        Plaintiff,      )       Case No. 08 C 6982
        v.                              )
                                        )       Judge Virginia M. Kendall
JALANCE HUNT, JOSE CORTES, RICHARD      )
DOWLING, JOSEPH MARTIS, PATRICK         )
BOYLE, DANIEL A. BINFA, DANIELLE N.     )
PHILP, and WILLIAM R. WHELEHAN,         )
Chicago Police Officers,                )
                                        )
                        Defendants.     )


**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Gregory Smith ("Smith") sued Chicago Police Officers JaLance Hunt ("Officer

Hunt"), Jose Cortes ("Officer Cortes"), Richard Dowling ("Sergeant Dowling"), Joseph Martis

("Officer Martis"), Patrick Boyle ("Sergeant Boyle"), Daniel Binfa ("Oficer Binfa"), Danielle Philp

("Officer Philp"), and William Whelehan ("Officer Whelehan") under 42 U.S.C. § 1983 alleging

violations of his civil rights. Smith's allegations arise from two separate incidents, one on December

7, 2007 and one on December 28, 2007. As to the December 7, 2007 incident, Smith alleges that:

(1) Officers Cortes and Hunt engaged in excessive force and Sergeant Boyle and Officers Binfa,

Philp, and Whelehan failed to intervene to stop the use of excessive force in violation of the Fourth

Amendment (Count I); (2) Officers Cortes, Hunt, and unknown Chicago police officers battered him

in violation of Illinois law (Count II); and (3) Sergeant Boyle and Officers Binfa, Philp, and

Whelehan failed to intervene and failed to provide adequate medical attention in violation of the

Fourth Amendment (Count III). As to the December 28, 2007 incident, Smith alleges that (1) Officer

Cortes engaged in excessive force and Sergeant Dowling and Officer Martis failed to intervene and provide medical attention (Count IV); (2) Officer Cortes battered him (Count V); (3) Sergeant Dowling and Officer Martis failed to intervene and failed to provide adequate medical attention (Count VI); and (4) Sergeant Dowling and Officers Cortes and Martis failed to provide medical attention (Count VII). Finally, Smith brings a state law claim against the City of Chicago for indemnification (Count VIII). Sergeant Boyle and Officers Philp, Binfa, and Whelehan move for summary judgment as to Count III of Smith's Second Amended Complaint and Sergeant Dowling and Officers Martis and Cortes move for summary judgment as to Count VII of Smith's Amended Complaint. For the reasons stated below, the Court grants in part and denies in part the Defendants' Motion.

## STATEMENT OF FACTS[1]

### I.    The December 7, 2007 Incident

Just before midnight on December 7, 2007, Officers Hunt and Cortes spotted Smith on the street from their car. (Pl. 56.1 Resp. ¶ 3.) Smith was wanted for a parole violation and an arrest warrant had been issued for that violation. (Pl. 56.1 Resp. ¶ 3.) When Smith saw Officers Cortes and Hunt, he started running from the officers. (Pl. 56.1 Resp. ¶ 4.) Officer Hunt jumped out of the car and pursued Smith on foot while Officer Cortes followed down the street in the car. (Pl. 56.1 Resp. ¶¶ 6-7.) At the same time, Officer Cortes reported the foot pursuit while it was occurring over the radio. (Pl. 56.1 Resp. ¶ 7.)

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Fact as follows: citations to Defendants' Statement of Uncontested Material Facts have been abbreviated to "Def. 56.1 Ex. ___."; citations to Smith's Additional Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 Add. Facts Ex. ___."; citations to Smith's Response to Defendants' Rule 56.1(a) Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 Resp. ¶ ___."; citations to Defendants' Response to Smith's Additional Statement of Undisputed Material Facts have been abbreviated to "Def. 56.1 Resp. ¶ ___."

After some time, Smith grew tired of running. (Pl. 56.1 Resp. ¶ 10.) Seeing officers approaching him from both in front of him and behind him, he got on his knees and put his hands above his head. (Pl. 56.1 Resp. ¶ 10; Def. 56.1 Resp. ¶¶ 3-4.) Once Smith was on his knees, he was rushed by at least Officers Hunt and Cortes and taken to the ground. (Pl. 56.1 Resp. ¶ 11; Def. 56.1 Resp. ¶ 6.) Smith was then punched, kicked, and stomped on before he was placed into handcuffs. (Pl. 56.1 Resp. ¶ 11.) Specifically, one officer placed his knee on Smith's neck and Cortes began stomping on Smith's left hand, while other officers were kicking and punching him. (Def. 56.1 Resp. ¶¶ 7-8.) Smith was not punched or kicked after he was in handcuffs. (Pl. 56.1 Resp. ¶ 11.) Once he was apprehended, the officers discovered that Smith was in possession of approximately fifteen grams of crack cocaine with an estimated street value of $1,845 and $700 in cash. (Pl. 56.1 Resp. ¶ 5.)

While the parties agree that a number of officers responded to Officer Cortes's call for back-up, they disagree about when the officers arrived at the scene and what the officers saw. Targeted Response Unit Officers Philp, Whelehan, and Binfa ("the Responding Officers"), who were patrolling in the area together that night in their marked squad car, heard Officer Cortes call out the foot pursuit over the radio. (Pl. 56.1 Resp. ¶ 12.) The Responding Officers drove to the general location of the pursuit, but stopped their car upon hearing an officer call out on the radio for their car to "stop, stop, stop" in rapid succession. (Pl. 56.1 Resp. ¶ 13.) At their depositions, the Responding Officers testified that when they arrived at the scene they left their squad car together and found Officer Hunt, who already had Smith in custody in handcuffs. (Def. 56.1 Ex. F, Dep. of Danielle Nicole Philp ("Philp Dep.") at 20:4-9, 21:15-22:14; Ex. G, Dep. of William Whelehan ("Whelehan Dep.") at 17:13-18:9; Ex. H., Dep. of Daniel Binfa ("Binfa Dep.") at 17:2-14, 19:17-

20:22, 21:17-24:3.)  Officers Philp, Whelehan, and Binfa testified that they did not see any injury to Smith's hand, nor did they hear him complain about any injury.  (Philp Dep. at 29:2-17; Whelehan Dep. at 19:14-20:2; Binfa Dep. at 24:9-25:16.)  The Responding Officers also testified that they did not see Officers Hunt or Cortes stomp on Smith's hand and that they left the scene shortly after arriving because other officers arrived and they were no longer needed.  (Philp Dep. at 26:20-27:5; Whelehan Dep. at 23:6-9; Binfa Dep. 44:8-18.)

Another officer, Sergeant Boyle, (Hunt Dep. at 44:1-5.), also responded to Officer Cortes's radio call.  Sergeant Boyle testified at his deposition that he arrived on the scene after Smith was handcuffed.  (Def. 56.1 Ex. I, Dep. of Sergeant Patrick Boyle ("Boyle Dep.") at 11:8-12:20.) Sergeant Boyle testified that he did not see Officer Cortes stomp on Smith's hand, nor did not see any officers kick or punch Smith.  (Boyle Dep. at 32:14-20.)  According to Sergeant Boyle, when he first saw Smith, Smith was standing with Officer Hunt on the porch of a residence. (Boyle Dep. at 12:18-13:3.)  Sergeant Boyle testified that he approached Officer Hunt and asked him if he was okay.  (Boyle Dep. at 12:24-13:7.)  Once he learned that Officer Hunt was okay, he stated, he went to the back of the residence because that was the direction from which Smith had been running. (Boyle Dep. at 13:7-14.)

Sergeant Boyle further testified that he first saw Officer Cortes at the scene in the backyard of the residence.  (Boyle Dep. at 14:4-15:6.)  Sergeant Boyle stated that he explored the area from which Smith ran for approximately ten minutes before returning to the front of the residence.  (Boyle Dep. at 15:7-14.)  Sergeant Boyle testified that upon returning to the front of the residence, the officers decided that they should take Smith to the police station.  (Boyle Dep. at 15:15-19.)

Sergeant Boyle testified that he did not observe Smith's left hand at the scene or hear Smith say anything about his hand before Sergeant Boyle left the scene. (Boyle Dep. at 15:20-16:4, 32:6-11.)

Smith, however, testified at his deposition that in addition to Officers Cortes and Hunt, he was also being chased by a white male officer who was coming from the alley. (Smith Dep. at 181:1-12.) Smith testified that once he got on his knees, the police "bum-rushed" him and that they were "all over" him. (Smith Dep. at 181:13-183:15.) Smith also testified that as Cortes was stomping on his hand in the presence of the other officers, one of the officers said "that's what we do to dude that run." (Smith Dep. at 187:8-18.) Smith contends that after he was beaten in the presence of the other officers, the officers on the scene stood there looking at him and did not offer to help him up. (Def. 56.1 Ex. C, Dep. of Gregory Lynn Smith ("Smith Dep.") at 193:2-10, 194:16-18.) Smith testified that he does not know whether any of the officers were female. (Smith Dep. at 188:13-17.)

Smith also presents the testimony of three eye witnesses, Ray Crawford ("Crawford"), Myron Perkins ("Perkins"), and Robert Priest ("Priest"), who all claim that Smith was beaten in the presence of between three and five Chicago police officers. (Pl. 56.1 Add. Facts Ex. A, Dep. of Ray Crawford ("Crawford Dep.") at 87:7-15; Dep. of Myron J. Perkins ("Perkins Dep.") at 97:24-98:7, 112:1-17; Ex. C, Dep. of Robert Leon Priest ("Priest Dep.") at 74:16-20; 76:12-15; 84:19-85:5.) Specifically, Crawford, who saw the incident from the street, testified that he saw Smith surrounded by four-to-five officers. (Crawford Dep. at 86:3-88:21.) Crawford identified one of the officers as Hispanic and one as white. (Crawford Dep. at 89:1-16.) Perkins, who also saw the incident from the street, likewise testified that he saw four-to-five officers: two-to-three white officers, one African-American officer, and one Hispanic officer. (Perkins Dep. at 112:1-17.) Perkins testified that none of the

5

officers were female.  (Perkins Dep. at 13-14.)  Priest, who saw the incident from his home, testified

that he saw between three-to-four officers surrounding Smith.  (Priest Dep. at 76:9-15, 84:19-85:5.)

Priest testified that one white or Hispanic officer was beating Smith, (Priest Dep. at 74:16-20.), while

at least two others—one African-American—were watching.  (Priest Dep. at 85:6-11.)  Priest could

not tell whether any of the officers were female.  (Priest Dep. at 12-14.)  Both Crawford and Perkins

testified that they heard Smith screaming and "hollering" about his hand in the presence of four or

five officers.  (Crawford Dep. at 111:15-112:12; Perkins Dep. at 96:20-97:10, 120:15-19, 137:16-

18.)

Smith testified that he complained about his hand to Officers Cortes and Hunt while he was

at the scene of arrest and again while he was in the car on the way to the police station.  (Smith Dep.

at 301:12-302:5.)  Nevertheless, it is undisputed that the Responding Officers did not take Smith into

custody or transport him from the scene of arrest to the police station.  (Pl. 56.1 Resp. ¶ 17.)  It is

also undisputed that Sergeant Boyle did not transport Smith from the scene to the police station.  (Pl.

56.1 Resp. ¶ 27.)

Sergeant Boyle did, however, return to the police station after Smith's arrest.  (Pl. 56.1 Resp.

¶ 26; Def. 56.1 Resp. ¶ 14.)  Approximately thirty minutes passed between the time of Smith's arrest

and when Sergeant Boyle had any interactions with Smith at the station.  (Pl. 56.1 Resp. ¶ 27.)  After

Sergeant Boyle arrived at the station, Smith told him to look at his hand and Sergeant Boyle said he

was going to try and get something done.  (Pl. 56.1 Resp. ¶ 31.)  At Sergeant Boyle's direction,

Officers Lester Scott and Martis, members of the gang team, took Smith from the police station to

the Emergency Room at Holy Cross Hospital.  (Pl. 56.1 Resp. ¶¶ 30, 32-33.)  Boyle did not have any

further interaction with Smith on December 7, 2007.  (Pl. 56.1 Resp. ¶ 34.)

Smith arrived at Holy Cross Hospital before 1:25 a.m. on December 8, 2007. (Pl. 56.1 Resp. ¶ 35.) He was admitted to the hospital for a finger dislocation to the ring finger on his left hand between 1:45 a.m. and 3:00 a.m., and was released back into police custody at about 3:15 a.m. (Pl. 56.1 Resp. ¶ 35.) Smith was given morphine and Valium for the pain. (Def. 56.1 Resp. ¶ 16.) Smith was given instructions to return to the emergency room if the condition worsened, to follow up with his own doctor in two days, and to keep the splint on for one week. (Pl. 56.1 Resp. ¶ 35.)

## II.    The December 28, 2007 Incident

On December 28, 2007, at approximately 9:30 p.m., Officer Cortes, Officer Martis, and Sergeant Dowling arrested Smith at his residence. (Pl. 56.1 Resp. ¶ 36.) The officers found Smith sitting on a couch on the second floor. (Pl. 56.1 Resp. ¶ 37.) Dora Smith, Smith's mother, heard a commotion in the upstairs apartment of her building and went upstairs. (Def. 56.1 Resp. ¶¶ 22-23.) When she arrived at the second floor, she saw two police officers with their guns out pointed at Smith's head and one of the officers had his knee on Smith's sore hand. (Def. 56.1 Resp. ¶ 23.) The officers slapped his injured finger in an effort to get him to reveal information about a drug dealer named "Boo Man." (Pl. 56.1 Resp. ¶ 38; Def. 56.1 Resp. ¶ 26.)

While at the scene, all three officers noticed that Smith had a dirty bandage on his finger. (Pl. 56.1 Resp. ¶¶ 39-41.) Officer Martis also noticed that Smith's finger was emitting a foul odor. (Pl. 56.1 Resp. ¶ 39.) Officer Martis thought it smelled like a dead carcass, the bandage was multi-colored and appeared greenish-yellowish, and it looked like it had not been taken care of. (Pl. 56.1 Resp. ¶ 39.) Sergeant Dowling thought the bandage looked like it had been there awhile, (Pl. 56.1 Resp. ¶ 41.), but he did not notice a foul odor. (Pl. 56.1 Resp. ¶ 43.) The officers handcuffed Smith with the handcuffs placed in front of him so his bandaged finger would not be re-injured. (Pl. 56.1

Resp. ¶ 46.)  After searching the second floor, the officers found that Smith was in possession of approximately thirteen grams of crack cocaine and an estimated three grams of heroin, with an estimated street value of $2,049.  (Pl. 56.1 Resp. ¶ 45.)

Sergeant Dowling and Officers Martis and Cortes all testified that while at the arrest scene, they did not think Smith was in pain because Smith did not indicate that he was in pain, nor did he ask the officers for medical attention.  (Martis Dep. at 44:20-45:12; Cortes Dep. at 125:16-19 Dowling Dep. at 36:18-20, 37:3-19.)  Sergeant Dowling testified that he asked Smith about his hand and Smith told him that he had cut it earlier and that he had gone to the hospital and had it checked out.  (Def. 56.1 Ex. M, Dep. of Richard Dowling ("Dowling Dep.") at 34:15-34:8.)  Sergeant Dowling further testified that he was concerned about the condition of Smith's hand, but that once he heard that Smith had sought treatment, he was no longer concerned that Smith needed immediate treatment.  (Dowling Dep. at 36:7-14.)  All three officers testified that they did not take Smith to the hospital directly from the scene because they did not believe he needed immediate care.  (Def. 56.1 Ex. K, Dep. of Joseph Martis ("Martis Dep.") at 44:20-45:12; Ex. B, Dep. of Jose Cortes ("Cortes Dep.") at 125:16-19; Dowling Dep. at 34:7-38:12, 41:12-44:22.)

Smith, however, contends that he was in need of immediate medical care.  (*See, e.g.*, Cortes Dep. at 131:21-132:14.)  In addition to pointing to the officers' testimony about what they observed, Smith provides the testimony of his mother, Dora Smith, who stated that she heard Smith yelling at an officer to get his knee off Smith's hand because it was hurting.  (Dora Smith Dep. at 74:10-13.)[2]

---

[2]The Court grants the Defendants' Motion to Strike Theodis Jackson's ("Jackson") affidavit because Smith failed to disclose him as a witness in his Initial Disclosures.  (*See* Def. 56.1 Ex. P.)  Federal Rule of Civil Procedure 26(a)(1) states that a party "must, without awaiting a discovery request, provide to the other parties: the name and, if known, the address and telephone number of each individual likely to have discoverable information . . . unless the use would be solely for impeachment."  If a party fails to disclose the required information, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

The officers left the residence at approximately 9:50 p.m. and brought Smith to the police station. (Pl. 56.1 Resp. ¶ 47.) After Smith was taken to the police station, the officers brought him upstairs and prepared the arrest report. (Pl. 56.1 Resp. ¶ 50.) At this time, the parties agree that Smith specifically told Officer Cortes that his hand was bothering him and that he wanted to go to the hospital to get it checked out. (Pl. 56.1 Resp. ¶ 51.) Once Officers Cortes and Martis completed the paperwork, Sergeant Dowling decided to have Smith taken to the lockup to be printed and then to a hospital to have a doctor check out his hand. (Pl. 56.1 Resp. ¶ 52.) Sergeant Dowling made this decision because he believed the lockup would not accept Smith with a bandaged hand from a prior injury. (Pl. 56.1 Resp. ¶ 53.) He thought Smith would be processed faster and would make bond court in the morning if he was taken to the hospital. (Pl. 56.1 Resp. ¶ 53.)

When Smith was received at the lockup on December 29, 2007 at 12:55 a.m., the lockup keeper's visual check of the arrestee indicated "Yes" for "Obvious Pain or Injury." (Def. 56.1 Resp. ¶ 33.) Smith was released from the lockup at 1:00 a.m. on December 29, 2007 and was transported to Holy Cross Hospital. (Def. 56.1 Resp. ¶ 34.) Approximately three-and-a-half hours passed from the time Smith was placed in custody at his house until the time he was brought to Holy Cross Hospital. (Pl. 56.1 Resp. ¶ 54.)

According to Smith's medical records for December 29, 2007, Smith had previously sustained a finger dislocation which was treated in the emergency department on December 8, 2007 and he was told to follow up with Stroger Hospital, which he failed to do. (Pl. 56.1 Resp. ¶ 55.) On December 22, 2007, Smith developed a redislocation of the finger and was again sent to the

---

justified or is harmless." Fed. R. Civ. P. 37(c)(1). Here, Smith has not offered any justification for the failure to disclose Jackson and the Defendants have been prejudice because they were not able to depose Jackson before the close of discovery and the filing of this Motion.

emergency department with a dislocated and infected finger. (Pl. 56.1 Resp. ¶ 55.) The finger was again treated and Smith was told to follow up with Stroger Hospital, which he did not do. (Pl. 56.1 Resp. ¶ 55.) On December 29, 2007, Dr. Criswell diagnosed Smith with gangrene of the left ring finger and his finger was amputated. (Pl. 56.1 Resp. ¶ 55; Def. 56.1 Resp. ¶ 36.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (" 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### I.      Count III—The December 7, 2007 Incident

Count III of Smith's Amended Complaint alleges that Sergeant Boyle and Officers Philp, Binfa, and Whelehan violated his civil rights under § 1983 by failing to intervene while Cortes and Hunt were using excessive force against him during the December 7, 2007 incident. Count III also alleges that Sergeant Boyle and Officers Philp, Binfa, and Whelehan failed to provide adequate medical attention to Smith's hand during the December 7, 2007 incident.

### A.      Failure to Intervene

A police officer "has a duty under § 1983 'to intervene to prevent a false arrest or the use of excessive force if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it.'" *See Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008) (quoting *Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003)). Thus, in an excessive force case, a police officer who is present and does not intervene to stop other officers from infringing the constitutional rights of citizens is liable under § 1983 if the officer had reason to know "that excessive force was being used, . . . *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original).

Smith cannot prevail on his failure to intervene claim, however, if he cannot first show that Officers Cortes and Hunt engaged in excessive force during the December 7, 2007 incident. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (holding that the plaintiffs could not prove their failure to intervene claim because there was no underlying constitutional violation); *Abdullahi*, 423 F.3d at 767-68 ("[B]y definition, if there was no excessive force then there can be no failure to

intervene."); *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) ("Simply put, there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention."). Thus, the Court must first discuss whether Hunt and Cortes's behavior on December 7, 2007 rises to the level of a constitutional violation.

Because Smith's claim of excessive force arises in the context of an arrest, the Court evaluates the officers' use of force according to the reasonableness standard of the Fourth Amendment. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1004 (7th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). To determine whether the force used to effect an arrest is unreasonable, a court must examine the "totality of circumstances" surrounding the incident. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). The Fourth Amendment's reasonableness test is an objective one. *Graham*, 490 U.S. at 396. Thus, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. Moreover, the reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97. Courts should consider factors such as "[t]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. In sum, "the excessive force inquiry 'looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended.'" *Estate of Escobedo*

*v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) (quoting *McDonald v. Haskins*, 966 F.2d 292, 292-93 (7th Cir. 1992)).

Here, after making all reasonable factual inferences in Smith's favor, a reasonable jury could determine that the force Officers Cortes and Hunt used to effect his arrest was excessive in light of the circumstances. While Smith initially ran from the officers, he eventually stopped, got down on his knees, and put his hands over his head. When the officers reached Smith, he was not resisting arrest or fleeing. Despite Smith's position, which was not threatening to bystanders or to the officers themselves, at least Officers Cortes and Hunt took him to the ground. At least Officers Cortes and Hunt kicked and punched Smith and stomped on his hand. Smith's crimes were not serious; he had an outstanding arrest for violating his probation and when he was arrested, the officers found that he was in possession of a small amount of crack cocaine. If the jury believes Smith's testimony, it could conclude that he was beaten as a punishment for running from the officers. From the perspective of an objective officer on the scene, it is possible for a jury to conclude that the amount of force used against Smith was unreasonable and therefore excessive.

The Court next turns to whether Sergeant Boyle and the Responding Officers failed to intervene to prevent Officers Cortes and Hunt from using excessive force. As discussed above, to succeed on his failure to intervene claim, Smith must show that Sergeant Boyle and the Responding Officers: (1) had reason to know that Officers Cortes and Hunt were using excessive force, and (2) had a realistic opportunity to intervene to prevent the use of excessive force. *See Yang*, 37 F.3d at 285.

### i.      The Responding Officers

The Responding Officers argue that they did not have reason to know that Officers Cortes and Hunt were using excessive force or have a realistic opportunity to intervene because they did not arrive at the scene until after Officers Cortes and Hunt had stopped beating Smith. Specifically, the Responding Officers testified that when they arrived at the scene, they found Officer Hunt with Smith and that Smith was already in handcuffs. The Responding Officers all testified that they did not see Officers Hunt or Cortes kick or punch Smith or stomp on his hand.

Smith admits that he was not kicked, punched, or stomped on after he was in handcuffs. Nevertheless, Smith has provided enough evidence to raise a genuine issue of fact as to whether the Responding Officers were present before he was in handcuffs—when Officers Cortes and Hunt were kicking, punching, and stomping on his hand—and thus had reason to know that excessive force was being used. Smith testified that during the chase, he was running from Officers Cortes and Hunt as well as a third officer who Smith described as a white male. Smith also testified that when he stopped, got on his knees, and put his hands up, the police "bum-rushed" him and were "all over" him, suggesting that more that two officers were present.

Further, Crawford, Perkins, and Priest testified that there were at least three and up to five officers present while Smith was being beaten, and Perkins identified three of them as white male officers. Because neither Officer Hunt nor Officer Cortes is white—Smith has identified the African-American officer on the scene as Officer Hunt and the Hispanic officer on the scene as Officer Cortes (*See, e.g.*, Def. Ex. C, Dep. of Gregory Lynn Smith ("Smith Dep.") at 199:4-6.)—the jury could infer that, because the Responding Officers were the first officers besides Officers Hunt and Cortes at the scene, these three were among the officers Smith, Crawford, Perkins, and Priest

saw. Officers Philp is a white female and at least one of her partners is a white male. (Def. 56.1 Ex. A, Dep. of JaLance Hunt ("Hunt Dep.") at 40:20, 41:3-10.)

Additionally, even though Perkins only identified three white male officers and both Smith and Priest testified that they did not notice or could not tell whether any of the officers were female, the Responding Officers all testified that they left their squad car together and arrived at the scene together. Priest testified that it was dark and cold and that the officers were wearing skull caps or hoods. Thus, the jury could either believe that Officer Philp was on the scene and was simply not identified as a female officer, or that Officer Philp, who arrived at the scene at the same time as her two white male partners, was in the area and had reason to know that Officers Cortes and Hunt were violating Smith's constitutional rights. If the jury believes Smith's testimony, as well as the testimony of Crawford, Perkins, and Priest, it could reasonably find that the Responding Officers—the first officers other than Officers Cortes and Hunt to the scene—had reason to know that Officers Cortes and Hunt were using excessive force.

Similarly, Smith has provided sufficient facts that would allow a jury to believe that the Responding Officers had a realistic opportunity to intervene. A "realistic opportunity to intervene" exists whenever an officer "could have 'called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang*, 37 F.3d at 285). This "analysis almost always implicates questions of fact for the jury: 'Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Abdullahi*, 423 F.3d at 774 (quoting *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)). Here, as

discussed above, viewing the facts in the light most favorable to Smith, a jury could reasonably believe that the Responding Officers, who were standing around watching Officers Cortes and Hunt kicking, punching, and stomping on Smith, had time to intervene and were capable of preventing Officers Cortes and Hunt from using excessive force.

### ii.    Sergeant Boyle

Smith has abandoned his claim for failure to intervene against Sergeant Boyle.   In his Memorandum of Law Responding to the Defendants' Motion for Summary Judgment, Smith argues generally that the "Defendants were present as Mr. Smith was beaten in the vacant lot,"  (R. 49., Pl. Mem. of Law and Arg. in Opp. to Def. Mot. for Partial Summary Judgment at 7.), but argues specifically only that "[a] logical inference from the evidence is that Defendants Binfa, Philp, and Whelehan, as the first officers responding to the vacant lot, were the officers described by Mr. Crawford, Mr. Perkins and Mr. Priest."  (R. 49 at 8.)  Smith makes no specific arguments as to Sergeant Boyle and Smith's own witnesses testified that they saw, at most, three other officers at the scene beside Officers Cortes and Hunt.  Because Smith has failed to make any argument as to Sergeant Boyle and because, even when taken in the light most favorable to Smith, the evidence in the record fails to demonstrate that Sergeant Boyle knew that Officers Cortes and Hunt were engaging in excessive force, the Court grants Sergeant Boyle's Motion for Summary Judgment as to the failure-to-intervene claim in Count III.

### B.    Denial of Adequate Medical Care

Smith also alleges in Count III that Sergeant Boyle and the Responding Officers denied him adequate medical care.  A claim challenging the conditions of confinement by a pretrial detainee who has not had a judicial determination of probable cause (a *Gerstein* hearing) is "governed by the

Fourth Amendment and its objectively reasonable standard." *See Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *see also Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). Four factors are relevant in determining whether a defendant's conduct was objectively reasonable. *See Williams*, 509 F.3d at 403. The first factor is whether the officer has notice of the detainee's medical needs, either by the detainee's words or through the officer's observation of the detainee's physical symptoms. *Id*. at 403. The second factor considers the seriousness of the medical need. *Id*. The seriousness of the medical condition need not, on its own, "rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments." *Id*. "Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Id*. Police interests factor into the reasonableness determination under the fourth factor. *Id*. This final factor "is wide-ranging in scope and can include administrative, penological, or investigatory concerns." *Williams*, 509 F.3d at 403.

### i. The Responding Officers

Taking the evidence in the light most favorable to Smith, a reasonable jury could believe that the Responding Officers failed to provide adequate medical attention to his hand. First, the Court has already found that there is an issue of fact as to whether Officers Cortes and Hunt used excessive force and whether the Responding Officers witnessed this use of unreasonable force and had an opportunity to intervene. Assuming, as the Court must, that the jury believes Smith's story, Crawford and Perkins's testimony could also lead a jury to believe that the Responding Officers heard Smith screaming and "hollering" about his hand in their presence and therefore had notice of Smith's medical need.

The Responding Offers argue that because they did not arrest Smith or take him into custody, they had no duty to provide him with medical attention. Smith, however, offers evidence that his injury and pain was the result of the beating inflicted on him by Cortes and Hunt while the Responding Officers stood by and watched. Beating a person in violation of the Constitution "impose[s] on the assailant a duty of prompt medical attention to any medical need to which the beating might rise." *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996).[3] Because a reasonable jury could believe that the Responding Officers were present at the time of Smith's beating, it could also believe that they had a duty to secure medical attention after he suffered injuries as a result of the beating. *See, e.g.*, *Petrovic v. City of Chicago*, No. 06 C 6111, 2008 WL 4286954, at *7 (N.D. Ill. Sept. 16, 2008) (Guzman, J.) (denying summary judgment for officers who saw their partner beat the plaintiff, yet did not take her to the hospital); *Kunz v. City of Chicago*, No. 01 C 1753, 2004 WL 2980642, at *10 (N.D. Ill. Dec. 23, 2004) (Zagel, J.) (denying summary judgment for officers who were present during the time the plaintiff suffered police-inflicted injuries).

A jury could also find that Smith's medical need was serious, particularly in light of the limited scope of requested treatment. The seriousness of a medical condition under the Fourth Amendment's reasonableness standard need not rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments. *See Williams*, 509 F.3d at 403. While the Seventh Circuit has given some guidance on this question, *compare Lopez*, 464 F.3d at 719 (finding plaintiff's allegations were sufficient to form objectively unreasonable conduct where he alleged he

---

[3] The deliberate indifference standard that applies to Fourteenth and Eighth Amendment challenges to conditions of confinement requires a higher showing on a plaintiff's part than is necessary under the objective reasonableness standard. *See Williams*, 464 F.3d at 403; *Lopez*, 464 F.3d at 718. Throughout this Opinion, the Court uses Eighth Amendment and due process cases merely as a guide, recognizing that Smith's condition need not rise to this level to survive the Defendant's Motion for Summary Judgment.

was shackled to a wall of an interrogation room for four days and nights and deprived of food, drink, and sleep) and *Florek v. Village of Mundelein*, No. 05 C 6402, 2010 1335526, at *9 (N.D. Ill. Mar. 31, 2010) (Valdez, J.) (concluding that a reasonable jury could find that the plaintiff had a serious medical need when she requested aspirin and an ambulance) *with Sides*, 496 F.3d at 828 (finding plaintiff's allegations did not rise to the level of unreasonableness required for a Fourth Amendment claim where he was forced to stand against an officer's car during which time his buttocks hurt and he felt dizzy and dehydrated), it remains helpful look to what constitutes a serious medical condition under the Eighth Amendment or Due Process Clause, recognizing that Smith's condition need not rise to this level to establish that his injured finger was a serious medical condition.

An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). A medical condition need not be life-threatening; it is sufficient that the condition would result in increased pain or further injury if it is not treated. *See Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) ("At minimum, a jury could find that, although not life threatening, [the plaintif's] vomiting could have led to increased pain or injury as a result of her heart condition, allowing the plaintiff to survive the defendant's motion for summary judgment on the issue of whether she exhibited a serious medical condition.") Whether a medical condition is "serious" is a factual inquiry to be resolved by the jury if the plaintiff provides enough evidence to survive summary judgment. *See Hayes*, 546 F.3d at 523.

Here, the medical records from Holy Cross Hospital show that Smith was diagnosed with a complete dislocation of his fourth finger on his left hand. (Pl. 56.1 Resp. ¶ 35.) Smith's pain scale

was documented as a 10-out-of-10, and he was given morphine and Valium for the pain. (Def. 56.1 Resp. ¶ 16; *see* Def. 56.1 Ex. J; Pl. 56.1 Ex. D.)[4] Although not life threatening, or even significantly serious, a jury could find a lay person would perceive the need for a doctor's care or that a delay in treatment would increase Smith's pain or further his injury. Based on these facts, and when taking into account that the scope of treatment—taking Smith to the emergency room to have a doctor treat his injured finger—was not great, a reasonable jury could find that Smith's medical need was serious. *See, e.g.*, *Kunz*, 2004 WL 2980642, at *8 (finding a plaintiff's multiple bruises, abrasions to his face, and broken ribs to be an "objectively serious medical need" under the stricter standard of the Fourteenth Amendment).

Finally, police interests do not outweigh the other factors. Smith was not arrested for a particularly serious crime; he had violated his probation and officers found that he was in possession of approximately fifteen grams of crack cocaine with an estimated street value of $1,845 and $700 in cash. The Responding Officers have not provided any reason for taking Smith to the police station first, rather than directly to the hospital. Drawing all reasonable inferences in a light most favorable to the plaintiff, Smith has presented a genuine issue of material fact as to whether the Responding Officers' conduct in denying Smith immediate medical care was objectively unreasonable.

### ii.     Sergeant Boyle

On the other hand, having determined that no evidence in the record places Sergeant Boyle at the scene until after Smith was in handcuffs and had stopped screaming and "hollering" about his hand, the Court concludes that the testimony of Crawford and Perkins is not enough to establish a

---

[4] Although Plaintiff's 56.1 Statement of Additional Facts describes Smith's pain as being a 9-out-of-10, the hospital records show that it was actually documented as a 10-out-of-10.

genuine issue of fact as to whether Sergeant Boyle had notice of Smith's injured hand at the scene. Sergeant Boyle testified that he did not observe Smith's left hand at the scene, nor did he hear Smith say anything about his hand before leaving the scene. Smith provides no evidence to the contrary.

Smith testified that he told Officers Hunt and Cortes that his hand was hurting both in the car on the way to the police station and once he arrived at the station. (*See* Smith Dep. at 301:21-302:5.) Sergeant Boyle, however, did not transport Smith from the scene to the police station and was not present for these two conversations. At the station, about thirty minutes after he was arrested, Smith asked Sergeant Boyle to look at his hand and Sergeant Boyle told Smith that he would try to get something done. At Sergeant Boyle's direction, two members of the gang team took Smith to the Emergency Room at Holy Cross Hospital. Even taking the facts in the light most favorable to Smith, a reasonable jury could not find that Sergeant Boyle failed to provide Smith adequate medical attention. Once Sergeant Boyle had notice of Smith's injured hand, Sergeant Boyle made sure Smith received medical attention. For those reasons, Sergeant Boyle is entitled to Summary Judgment as to Smith's failure-to-provide-medical-attention claim in Count III.[5]

## II.     Count VII—The December 28, 2007 Incident

In Count VII of his Second Amended Complaint, Smith alleges that Martis, Cortes, and Dowling violated his Fourth Amendment right to adequate medical care during the December 28, 2007 incident. As discussed above, the four factors that are relevant in determining whether a defendant's conduct was objectively reasonable are: (1) whether the officer has notice of the

---

[5]The Court need not reach Sergeant Boyle's argument that he is entitled to qualified immunity on this claim. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) ("the officers' actions did not violate any of the plaintiff's constitutional rights; thus, there is no need to decide if those rights were clearly established at the time of the encounter").

detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests.

First, Sergeant Dowling and Officers Martis and Cortes do not dispute that they had notice that Smith had an injured finger. Sergeant Dowling and Officers Martis and Cortes all noticed that Smith was wearing a dirty bandage on his finger. The Defendants handcuffed Smith with the handcuffs placed in front of his body so as to avoid re-injuring his finger. Further, Smith has presented evidence that could lead a jury to believe that the officers themselves may have increased Smith pain or caused further injury to his finger. The officers admit that they slapped his injured finger in an effort to get him to reveal information about a drug dealer named "Boo Man." Smith's mother testified that Smith was "hollering" at Officer Cortes to get his knee off Smith's hand because it was hurting. If Sergeant Dowling and Officers Martis and Cortes exacerbated Smith's injury and pain, they have a duty to make sure he receives prompt medical care. *See Cooper*, 97 F.3d at 917. The officers at the scene had notice that Smith had an injured finger.

Second, Smith has presented sufficient evidence to create a genuine issue of material fact as to whether the injury to his finger was serious. Sergeant Dowling and Officers Martis and Cortes testified that while they were at the arrest scene, they did not think Smith was in pain because he did not tell them he was in pain, nor did he ask the officers for medical attention. Sergeant Dowling testified that he asked Smith about his finger, but Smith told him that he had previously sought medical attention. All three officers testified that they did not take Smith to the hospital directly from the scene of arrest because they did not believe that he needed immediate care. While at the scene, however, Officer Martis noticed that Smith's finger was emitting a foul smell, specifically testifying that it smelled like a dead carcass. Officer Martis also noticed that Smith's bandage

appeared greenish-yellowish and it looked like it was not well taken care of. Sergeant Dowling did not smell anything, but he did think that the bandage had been on Smith's finger for awhile.

At the hospital, Smith's pain was documented as a 9-out-of 10. The doctor diagnosed Smith with gangrene of the left ring finger and amputated his finger. Again, although not life threatening, a jury could find a lay person would perceive the need for a doctor's care or that a delay in treatment would increase Smith's pain or further his injury. Based on these facts, and when taking into account the fact that taking Smith to the Emergency Room before completing the paperwork at the police station would not have been overly burdensome in light of the seriousness of his medical need, a reasonable juror could find that Sergeant Dowling and Officers Cortes and Martis's conduct was unreasonable based on Smith's obvious pain and the nominal effort required to assuage it. *See, e.g.*, *Crenshaw v. Rivera*, No. 05-440, 2009 WL 377985, at * 23 (N.D. Ind. Feb. 12, 2009) (Cherry, J) (denying summary judgment as to plaintiff's claim for unreasonable medical care under Fourth Amendment where officers waited two hours to take her to a hospital to receive medical care for a non-life threatening leg injury).

Finally, the Court must take into account police interests in determining whether the Defendants' conduct was objectively unreasonable. *See Williams*, 509 F.3d at 403. Sergeant Dowling and Officers Martis and Cortes argue that two police interests favored their decision not to provide Smith with immediate treatment. First, they contend that because Smith was arrested with thirteen grams of crack cocaine and three grams of heroin, officers had an interest in promptly inventorying the drugs as evidence and filling out the paperwork relating to the arrest and charges against him. Second, the officers argue that Smith's expeditious processing weighs against the delay needed to examine and treat him. The circumstances of Smith's arrest, however, were not such that

the officers needed to delay attending to Smith's medical needs: the officers were not transporting a dangerous suspect or bringing Smith in for processing in a case that required the immediate involvement of additional officers. A reasonable juror could conclude that police interests do not weigh in favor of denying Smith immediate medical care.

Thus, drawing all reasonable inferences in a light most favorable to the plaintiff, Smith has presented a genuine issue of material fact as to whether Sergeant Dowling and Officers Cortes and Martis's conduct in denying Smith immediate medical care was objectively unreasonable.

## III.    Qualified Immunity

The Defendants argue that even if they cannot prevail on the merits, they are entitled to qualified immunity. Qualified immunity shields public officials from liability when they act in a manner that they reasonably believe to be lawful. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). To resolve a qualified immunity claim, the Court must decide whether the facts that a plaintiff has shown "make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *See Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201-03 (2001)). The Court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

Because Smith has established a genuine issue of material fact as to whether the Responding Officers violated Smith's Fourth Amendment rights by failing to intervene and failing to provide adequate medical attention and as to whether Sergeant Dowling and Officers Cortes and Martis violated Smith's Fourth Amendment right to adequate medical attention, the Court turns to whether

these rights were clearly established at the time of the Defendants' alleged misconduct. Under this standard, "[t]he contours of [the constitutional] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Chaklos v. Stevens*, 560 F.3d 705, 716 (7th Cir. 2009). A plaintiff may defeat a qualified immunity defense by pointing "to a clearly analogous case establishing a right to be free from the specific conduct at issue" or by showing that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Wheeler v. Lawson*, 539 F.3d 629, 640 (7th Cir. 2008) (citations omitted). The Supreme Court has rejected the notion that analogous cases must be exactly the same before an official is on notice that his conduct was unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Finally, where "the facts draw into question the objective reasonableness of the police action under the alleged circumstances," the court should deny summary judgment to allow for the further development of the disputed facts. *See Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996).

### A. Count III

#### i. Failure to Intervene

The Responding Officers do not dispute that at the time of the December 7, 2007 incident it was clearly established that an officer who is informed of the facts that establish a constitutional violation has a duty to intervene to prevent or stop the use of excessive force, even if he could have only "called for a backup, called for help, or at least cautioned [the excessive-force defendants] to stop." *Yang*, 37 F.3d at 285; *see also Abdullahi*, 423 F.3d at 774; *Lanigan*, 110 F.3d at 478; *Morfin*, 349 F.3d at 1001. Instead, the Responding Officers assert that they are entitled to qualified immunity on the failure-to-intervene claim in Count III based on the principles set forth in *Haynes v. Village*

*of Lansing*, 656 F. Supp. 2d 783 (N.D. Ill. 2009). In *Haynes*, the plaintiff, alleged that a number of officers used excessive force in carrying out her arrest. *Id*. at 786. The court first found that there was a genuine issue of fact as to whether one officer's repeated use of his taser was excessive force and that a reasonable jury could conclude that another officer, who was present throughout, failed to intervene to stop the excessive use of force. *Id*. at 793. As to four other officers who did not arrive at the scene until after the first officer tased the plaintiff, the court found that none of these officers either acted unreasonably or had the opportunity to prevent harm to the plaintiff. *Id*. at 793-94. Thus, the Responding Officers assert that, like the four officers in *Hayes*, they are entitled to qualified immunity on Smith's failure-to-intervene claim because they were not present when Officers Hunt and Cortes were using excessive force.

Here, however, as discussed above, the issues of whether the Responding Officers were present while Officers Cortes and Hunt engaged in excessive force and whether they had an opportunity to intervene remain in dispute. Because these factual disputes are inseparable from the Responding Officers' argument as to why they are entitled to qualified immunity, the Court denies the Responding Officers' Motion for Summary Judgment on Smith's failure-to-intervene claim in Count III. *See Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (affirming the district court's denial of qualified immunity on an excessive force claim in light of the factual disputes that "bear on the objective reasonableness of the force used to arrest [the plaintiff]"); *see also Clash*, 77 F.3d at 1048 (citing *Johnson v. Jones*, 515 U.S. 304 (1995)) (finding that the district court "lack[ed] the 'given facts' that either do or do not show a violation of 'clearly established law'")

### ii.    Failure to Provide Adequate Medical Attention

The Responding Officers make a similar argument to support their claim for qualified immunity on the failure-to-provide-adequate-medical-attention claim in Count III.  They do not dispute that on December 7,  2007 it was clearly established that an officer who is present when fellow officers beat a detainee has a duty to secure medical attention for the detainee, *see, e.g.*, *Cooper*, 97 F.3d at 917; *see also, e.g.*, *Kunz*, 2004 WL 2980642, and that police officer's failure to provide medical treatment is evaluated under an objective reasonableness standard as opposed to a deliberate indifference standard.  *See Sides*, 496 F.3d at 823 (citing *Graham*, 490 U.S. 386); *see also, e.g.*, *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n. 14 (7th Cir. 2000); *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999); *Reed v. City of Chicago*, 77 F.3d 1049, 1052 (7th Cir. 1996); *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992).  They argue instead that "there is no evidence that their actions were objectively unreasonable."

The Court has found that there is a genuine issue of material fact as to whether the Responding Officers' decision to leave the scene and not ensure that Smith received prompt medical care was objectively reasonable under the circumstances.  Like their liability under Smith's failure-to-intervene-claim, the Responding Officers' liability here hinges on whether they were present during the beating, as well as whether they heard Smith crying out in pain about his hand.  Because these factual disputes are inseparable from the Responding Officers' argument as to why they are entitled to qualified immunity, the Court also denies the Responding Officers' Motion for Summary Judgment on Smith's failure-to-provide-adequate-medical-attention claim in Count III.  *See Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008).

### B.     Count VII

Sergeant Dowling and Officers Cortes and Martis assert that they are entitled to qualified immunity as to Count VII because reasonable officers could disagree about whether, under the circumstances, they were required to take Smith directly to the hospital.  As of December 28, 2007, it was clearly established that pretrial detainees have a right to prompt medical attention.  *See, e.g.*, *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991) (police must obtain prompt medical care for an arrested person with an objectively serious condition).  Further, as discussed above, it was also clearly established that a police officer's failure to provide such treatment is evaluated under an objective reasonableness standard as opposed to a deliberate indifference standard.  *See Sides*, 496 F.3d at 823 (citing *Graham*, 490 U.S. 386); *see also, e.g.*, *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n. 14 (7th Cir. 2000); *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999); *Reed v. City of Chicago*, 77 F.3d 1049, 1052 (7th Cir. 1996); *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992).  Finally, as Smith points out, "[w]hether a delay in providing medical treatment has negatively affected a plaintiff's well-being is an assessment that is made in hindsight, so it cannot affect an officer's initial decision to seek treatment for an inmate."  *See Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (rejecting the defendants' argument that they could not have known that they could be found liable based on the kind of evidence the plaintiff presented at trial and denying the defendants' claim of qualified immunity).

Taking these precedents into account and assuming—as the Court must at this stage—that he knew of Smith's injury and that his injury was serious, a jury could conclude that a reasonable officer would understand that a three-and-a-half hour delay in securing medical attention would violate Smith's Fourth Amendment rights.  This is particularly true where Smith has presented

evidence suggesting that the officers acted to affirmatively increase Smith's pain. *See, e.g.*, *Cooper*, 97 F.3d at 917; *Kunz*, 2004 WL 2980642. For those reasons, the Court concludes that Sergeant Dowling and Officers Cortes and Martis are not entitled to qualified immunity on Count VII and thus denies their Motion for Summary Judgment on Count VII.

## **CONCLUSION AND ORDER**

For the reasons stated, the Court grants Sergeant Boyle's Motion for Summary Judgment as to both claims in Count III. The Court denies Officers Philp, Whelehan, and Binfa's Motion for Summary Judgment as to both claims in Count III. Finally, the Court denies Sergeant Dowling and Officers Cortes and Martis's Motion for Summary Judgment as to Count VII.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 27, 2010